**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                      No.  CR 12-3182 JB

JEROME ECKSTEIN,

     Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on Defendant Jerome Eckstein's Formal

Objections to the Presentence Report, filed May 26, 2015 (Doc. 929)("Objections").  The Court

held a sentencing hearing on September 1, 2015.  The primary issues are: (i) whether the "credits

against loss" provision found in the commentary to U.S.S.G. § 2B1.1 should apply in this case,

reducing the loss amount to take into account the money Defendant Jerome Eckstein paid back

prior to his arrest; (ii) whether the Court should apply a 6-level enhancement under U.S.S.G. §

2S1.1(b)(1), which applies when a defendant "knew or believed that any of the laundered funds

were the proceeds of, or were intended to promote (i) an offense involving . . . distribution of a

controlled substance"; and (iii) whether the Court should apply a 2-level enhancement under

U.S.S.G. §  2S1.1(b)(3) for "sophisticated laundering."   The Court will overrule Eckstein's

objection to the failure in the Presentence Investigation Report (dated June 11, 2015), re-

disclosed June 11, 2015, to apply the "credits and loss" provision found in the commentary to §

2B1.1.  The Court will overrule Eckstein's objection and impose a 6-level enhancement under §

2S1.1(b)(1), because the Court concludes that Plaintiff United States of America has established

by a preponderance of the evidence that Eckstein knew or believed that the laundered funds were

drug proceeds, or that they were represented to be drug proceeds.  Finally, the Court will not

apply a 2-level enhancement under § 2S1.1(b)(3) for "sophisticated laundering."

## FACUTAL BACKGROUND

The Court takes its facts from the PSR, which the United States Probation Office

("USPO") prepared.  In June, 2011, the Federal Bureau of Investigation ("FBI") initiated an

investigation code-named Operation Rain Check into co-Defendant Christopher Roybal, who

was the sole target.  See PSR ¶ 11, at 8.  A Confidential Human Source ("CHS-1") had identified

C. Roybal as someone who was selling kilograms of cocaine in the Albuquerque, New Mexico,

Metropolitan area.  See PSR ¶ 12, at 8-9.  "The FBI Safe Streets Task Force, through

investigation of C. Roybal, identified C. Roybal as a cocaine distributor throughout the state of

New Mexico."  PSR ¶ 12, at 8-9.  The FBI conducted three separate one-kilogram purchases of

cocaine and a controlled purchase of eight ounces of cocaine, and numerous multi-pound

purchases of high-grade marijuana.  See PSR ¶ 12, at 9.

> The CHS-1 informed agents that C. Roybal was one of the most substantial
> cocaine dealers in Northern and Central New Mexico.  Based on statements made
> by C. Roybal to the CHS-1, C. Roybal was distributing approximately 15
> kilograms of cocaine each week.  C. Roybal also informed the CHS-1 that he was
> distributing high grade marijuana.  C. Roybal informed the CHS-1 that he was
> generating $60,000 in cocaine profits on a monthly basis.

PSR ¶ 12, at 9.  The investigation identified C. Roybal as the leader of the C. Roybal Drug

Trafficking Organization ("C. Roybal DTO"), as he controlled the distribution of money flow on

the C. Roybal DTO's behalf.  See PSR ¶ 12, at 9.  The investigation revealed nineteen

individuals were involved in the C. Roybal DTO in various capacities and roles, see PSR ¶ 11, at

8, including Eckstein, who laundered the C. Roybal DTO's drug proceeds through his car wash

and real estate business, see PSR ¶ 20-44, at 13-20.

- 2 -

## PROCEDURAL BACKGROUND

On September 9, 2014, a sixty-three-Count Second Superseding Indictment was filed in the United States District Court for the District of New Mexico, charging Eckstein with the following: (i) two counts of Conspiracy to Launder Monetary Instruments under 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. 1956(h) (Counts 38 and 39); and (ii) one count of Laundering of Monetary Instruments and Aiding and Abetting under 18 U.S.C. §§ 1956(a)(3)(B) and 2 (Count 40). On March 5, 2015, Eckstein pled guilty to Count 40, which charged him with Laundering of Monetary Instruments and Aiding and Abetting, in violation of 18 U.S.C. § 1956(a)(3)(B) and 2. See Plea Agreement, filed March 5, 2015 (Doc. 820)("Plea Agreement"). In the Plea Agreement, the parties recommend, among other things:

a. The Defendant and the United States have made an AGREEMENT pursuant to the Federal Rule of Criminal Procedure 11(c)(1)(C), that a sentence of up to 20 months imprisonment is the appropriate disposition in this case. This agreement takes into account the Defendant's acceptance of responsibility. The remaining components of the Defendant's sentence, including but not limited to any fine or restitution and the length and conditions of supervised release, shall be imposed by the Court after the presentation of evidence and/or argument by the parties.

b. With respect to the Sentencing Guidelines, the United States and the Defendant agree that USSG § 2S1.1(a)(2) governs the base level in this matter. The United States and the Defendant further agree that the loss amount under the table contained in USSG § 2B1.1 should be at least $30,000, but less than $70,000. Defendant retains the right to argue at sentencing that credit against loss in USSG § 2B1.1, commentary 3(e) applies to the facts. The United States retains the right to argue against such credit.

Plea Agreement at 6-7. The Plea Agreement also states the following regarding Eckstein's appellate rights: "The Defendant agrees to waive these rights and to plead guilty to Count 40 of the second superseding indictment, charging a violation of 18 U.S.C. §§ 1956(a)(3)(B), that

being Laundering of Monetary Instruments."  Plea Agreement at 2.  The Court held a sentencing hearing on September 1, 2015.

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006).  This presumption, however, is an appellate presumption and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v.

United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the Guidelines sentence. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.). On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

**LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS
UNDER THE GUIDELINES**

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481. The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and its Sixth Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. at 490. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 542 U.S. at 303 (emphasis omitted)(citations omitted)(internal quotation marks omitted). In United States v. Booker, the Supreme Court held that, because the sentencing guidelines are no longer mandatory, "Apprendi does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013). See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of Apprendi's requirement." (alterations omitted)(internal quotations marks omitted)). The Supreme Court has recently held that the requirements in Apprendi v. New Jersey apply to facts that increase a

defendant's mandatory minimum sentence.  See Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013).

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement findings analysis.  See 408 F.3d at 684-85.  United States v. Magallanez involved plain error review of a drug sentence in which a jury found the defendant, Magallanez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine.  See 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months to 121 to 151 months.  See United States v. Magallanez, 408 F.3d at 682-83.  The Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker made the Guidelines ranges "effectively advisory," the Tenth Circuit in United States v. Magallanez reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before."  408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[1]  "[T]he application of an enhancement . . . does not implicate the Supreme Court's holding in Apprendi v. New Jersey."  United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.).  The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted

---

[1]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation).  See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005).

Accord United States v. Ray, 704 F.3d at 1314.  A defendant may assert an error under Apprendi

v. New Jersey only where the fact at issue increased his sentence beyond the statutory maximum.

See United States v. O'Flanagan, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant

could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed

the statutory maximum"); United States v. Hendrickson, No. 12-5016, 2014 WL 6679446, at *6

(10th Cir. Nov. 25, 2014)(unpublished)[2](holding that, after Alleyne v. United States, "[i]t is well-

established that sentencing factors need not be charged in an indictment and need only be proved

to the sentencing judge by a preponderance of the evidence").  The Court has noted:

> The Court explained that, although the decision of the Supreme Court of the
> United States in Alleyne v. United States, . . . 133 S. Ct. 2151 . . . (2013), expands
> the rule from Apprendi v. New Jersey, 530 U.S. 466 . . . (2000)(holding that facts
> that increase the maximum sentence a defendant faces must be proven to a jury
> beyond a reasonable doubt), to cover facts that increase the mandatory minimum
> sentence, as well as the maximum sentence, it does not prohibit district judges
> from continuing to find advisory sentencing factors by a preponderance of the
> evidence.  See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL
> 4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

---

[2]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Hendrickson has persuasive value with respect to a material issue, and will assist the Court in its disposition of this MOO.

United States v. Cervantes-Chavez, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M. Nov. 3, 2014)(Browning, J.).

## ANALYSIS

The Court will overrule Eckstein's objection to the PSR's failure to apply the "credits and loss" provision found in the commentary to § 2B1.1.   The Court will impose a 6-level enhancement under § 2S1.1(b)(1), because the Court concludes that the United States has established by a preponderance of the evidence that Eckstein knew or believed that the laundered funds were drug proceeds, or that they were represented to be drug proceeds.  Finally, the Court will not apply a 2-level enhancement under § 2S1.1(b)(3) for "sophisticated laundering."

## I.     THE COURT WILL OVERRULE ECKSTEIN'S OBJECTION TO THE PSR'S FAILURE TO APPLY THE "CREDITS AGAINST LOSS" PROVISION FOUND IN THE COMMENTARY TO U.S.S.G. § 2B1.1.

The Court will overrule Eckstein's objection to the PSR's failure to apply the "credits against loss" provision found in the commentary to U.S.S.G. § 2B1.1.  The parties agree that U.S.S.G. § 2S1.1 controls the calculation of Eckstein's offense level.  Regarding the base offense level, § 2S1.1(a)(2) provides "8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds." U.S.S.G. § 2S1.1(a)(2).  The table in § 2B1.1 establishes by how much an offense level should be increased, by loss, so long as the loss is greater than $5,000.00.  See U.S.S.G. § 2B1.1. Eckstein asserts that Note 3(E) of the commentary to § 2B1.1 (the "credits and loss provision") should apply in this case, adjusting the loss amount downward to take into account the money Eckstein returned to the undercover employee ("UCE") prior to his arrest.  See Objections at 1-2. Because Eckstein returned the entire $50,000.00 to the United States before his arrest,

application of Note 3(E) would result in an increase of zero dollars under the table in § 2B1.1. The Court concludes that this argument fails for three reasons.

First, a plain reading of § 2S1.1's plain language counsels against the application of the "credits and loss provision" in Note 3(E) of § 2B1.1.  Section 2S1.1 states that § 2B1.1 should be referenced to determine the offense level increase based on the "value of the laundered funds" rather than the "loss" at issue in this case.  U.S.S.G. § 2S1.1.  The United States persuasively argues that the Sentencing Commission likely cross-referenced the monetary figures and offense levels in § 2B1.1 to "not recreate the same exact table corresponding to the value of the laundered funds."  United States' Response to Defendant Jerome Eckstein's Formal Objections to the Presentence Report and Sentencing Memorandum, filed June 19, 2015 (Doc. 967)("Response").  Additionally, under Eckstein's interpretation of § 2B1.1, those defendants involved in successful money laundering schemes would receive lighter sentences.  For example, a defendant who successfully accepts, "cleans," and returns $100,000.00 in drug proceeds would not receive an enhancement under § 2B1.1.  By contrast, a defendant who accepts, but is not able to clean $100,000.00 in drug proceeds, would receive an enhancement under § 2B1.1.  The Sentencing Commission cannot reasonably have intended to reward effective money laundering via the "credits and loss provision."  As reflected in § 2S1.1, therefore, the table in § 2B1.1 is merely consulted as a cross-reference to look for the "value of the laundered funds" and not to determine the "loss" at issue in this case.  Here, the value of the laundered funds was $50,000.00. The Probation Office, therefore, correctly assessed a 6-level increase for the value of the funds being greater than $30,000.00, but less than $70,000.00.

- 12 -

Second, as the United States notes, even if the "credits and loss provision" in Note 3(E) of § 2B1.1 were applied, the provision's language forecloses its application in this case.  See Response at 21-22.  When sentencing a defendant pursuant to § 2B1.1, as opposed to § 2S1.1, a court must determine the amount of loss at issue.  See United States v. Garcia, 939 F. Supp. 2d 1155, 1198 (D.N.M. 2013)(Browning, J.).  Loss is "the greater of actual or intended loss." U.S.S.G. § 2B1.1. cmt. n.3(A)(i).  As the United States observes, the commentary notes further define potential offsets against the loss amount.  See Response at 21-22.  The "credits against loss" provision allows offsets for

> [t]he money returned, and the fair market value of the property returned and the services rendered by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.  The time of the detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

U.S.S.G. § 2D1.1(b)(1), cmt. n.3(E)(i).  Eckstein asserts that, because he repaid his portion of the money to the United States "before he was arrested and before he detected any criminal investigation," the money he repaid should be offset against the loss amount for which he would otherwise be responsible under § 2B1.1.  Objections at 2.  If the credit and loss provision applies, however, it applies only in cases where there is repayment of money before the offense is detected.  Additionally, the provision defines "detection" as the earlier of when the government or victim discovers the offense, or when the defendant knew or reasonably should have known it was detected.  U.S.S.G. § 2D1.1(b)(1), cmt. n.3(E)(i).  Here, because there was a sting operation involving CHS-1 and UCE, there was never a time when Eckstein was engaged in the money laundering before the government was aware of it.

Finally, in terms of policy, allowing application of the "credits and loss provision" in Note 3(E) of § 2B1.1 would not reflect a money laundering scheme's full impact. The impact of a particular money laundering scheme is determined partly by looking at the amount of the funds laundered, in contrast to sentencing under § 2B1.1, which is concerned primarily with the "loss." As the United States observes, "[t]here is an intrinsic difference between a defendant who laundered $10 of drug money and then repaid it, and a defendant who laundered $1,000,000 and repaid it." Response at 22. To account for this difference between money laundering on the one hand, and typical offenses involving theft under § 2B1.1, § 2S1.1 measures harm by looking at the value of the money laundered rather than the "loss" to any particular party.

For these reasons, the Court overrules Eckstein's objection and applies the 6-level enhancement for the value of the funds being greater than $30,000.00, but less than $70,000.00.

**II.     THE COURT WILL IMPOSE A 6-LEVEL ENHANCEMENT UNDER § 2S1.1(b)(1), BECAUSE THE COURT CONCLUDES THAT THE UNITED STATES HAS ESTABLISHED BY A PREPONDERANCE OF THE EVIDENCE THAT ECKSTEIN KNEW OR BELIEVED THAT THE LAUNDERED FUNDS WERE DRUG PROCEEDS, OR THAT THEY WERE REPRESENTED TO BE DRUG PROCEEDS.**

The Court will overrule Eckstein's objection to the PSR's application of a 6-level enhancement under § 2S1.1(b)(1), which applies when a defendant "knew or believed that any of the laundered funds were the proceeds of, or were intended to promote (i) an offense involving . . . distribution of a controlled substance." U.S.S.G. § 2S1.1(b)(1)(i). Eckstein argues that, because he did not plead guilty to a count of conspiracy to commit money laundering, this enhancement should not apply. See Objections at 4. The United States correctly notes that, for an enhancement under § 2S1.1(b)(1) to apply, the United States need merely "establish by a preponderance of the evidence that the defendant knew or believed that the laundered funds were

drug proceeds (or represented to be, as this was a sting operation)."  Response at 22-23.  The United States has met its burden.

First, Eckstein knew or believed that C. Roybal and CHS-1 were drug dealers.  Eckstein and C. Roybal were in close contact, which included traveling out of state together.  See PSR ¶ 43, at 19.  Agents interviewed Eckstein's wife, Julie Eckstein, post-arrest.  See PSR ¶ 43, at 19.

> She acknowledged C. Roybal gave them Southwest Airlines buddy passes which were found at the residence.  Mrs. Eckstein also stated she and her husband flew with C. Roybal to Denver on buddy passes to attend a Denver Nuggets basketball game.  C. Roybal paid for everything, including hotel, basketball tickets and food with cash.  She added their family also traveled to Disneyland on buddy passes from C. Roybal.

PSR ¶ 43, at 19.  J. Eckstein also "informed agents she was aware C. Roybal was a drug dealer from Las Vegas, New Mexico."  PSR ¶ 43, at 19.  Eckstein told CHS-1 that all the money had to go through Eckstein because C. Roybal did not have a checking account, although he had the ability to round up money quickly.  See Transcript of Recorded Conversation Between CHS-1 and Eckstein (Clip 2) at 3, filed June 19, 2015 (Doc. 967-14).  Eckstein told CHS-1 that he had done many real estate deals with C. Roybal and, in CHS-1's initial meeting with Eckstein, CHS-1 asked Eckstein if he knew what C. Roybal did, and Eckstein affirmed.  See Transcript of Recorded Conversation Between CHS-1 and Eckstein (Clip 1) at 2-3, filed June 19, 2015 (Doc. 967-13).

The initial meeting between CHS-1, C-Roybal, and Eckstein at Little Anita's Restaurant on November 3, 2011 buttressed Eckstein's knowledge or belief about C. Roybal and CHS-1's activities.  See PSR ¶ 21, at 13.  At the meeting, Eckstein discussed his unique ability, because of his large real estate holdings and business accounts, to infuse large cash deposits into his businesses, clean the money up, and make it legitimate income.  See PSR ¶ 21, at 13.  CHS-1

- 15 -

asked Eckstein if he knew what C. Roybal did, and, again, Eckstein affirmed.  See Transcript of Conversation Between CHS-1, Eckstein, and C. Roybal at Little Anita's (Clip 1) at 13-14, filed June 19, 2015 (Doc. 967-5).  After the meeting, CHS-1 confirmed with C. Roybal that Eckstein knew they were drug dealers.  See Transcript of Conversation Between CHS-1, Eckstein, and C. Roybal at Little Anita's (Clip 2) at 1, filed June 19, 2015 (Doc. 967-6)("Little Anita's Clip 2").  C. Roybal affirmed, but they then discussed how it is not something they advertised.  Little Anita's Clip 2 at 1.

Second, Eckstein also had knowledge or believed that the UCE was a drug dealer.  Eckstein entered the initial meeting with the UCE knowing that CHS-1 had a "guy" interested in a car wash.  PSR ¶¶ 24-25, at 13-14.  In that meeting, the UCE expressed concern about the investment being traced back to him.  See PSR ¶ 25, at 14.  That Eckstein had knowledge or believed that CHS-1 and C-Roybal were drug dealers, and that these two individuals then introduced him to another potential investor who was concerned about money being traced back to him, is strong evidence that Eckstein knew or believed that the UCE was a drug dealer.  Further, later in a telephone call on January 16, 2012, the UCE told Eckstein that his money was "dirty."  PSR ¶ 27, at 14.  Later, the UCE met up with C. Roybal to provide Eckstein with the money.  See PSR ¶ 29, at 14.  Before Eckstein arrived, C. Roybal explained to the UCE that Eckstein got "kind of freaked out" by the January 16, 2012, call, in which the UCE told Eckstein that the money was "dirty."  PSR ¶ 29, at 14.  "C. Roybal and the UCE discussed smoothing things over with Eckstein.  C. Roybal told the UCE, for example, that C. Roybal is a 'gambler,' but that Eckstein did not ask where the money comes from."  PSR ¶ 29, at 14.  C. Roybal

explained that the only thing Eckstein needed to know was how much there was to invest.  See PSR ¶ 29, at 14.

Later, once Eckstein arrived, "C. Roybal brought up how the UCE said something that made Eckstein feel uncomfortable (i.e. referring to the money as 'dirty')."  PSR ¶ 30, at 14.  C. Roybal explained that Eckstein was a legitimate person, and talked about how C. Roybal and the UCE had their own businesses and were looking to invest profits.  See PSR ¶ 29, at 14.  Eckstein discussed his career and his desire for everything to be "up front and legit," but went on to state that "now my people that invest, they don't really tell me where it's coming from because I don't really care."  PSR ¶ 30, at 14.  UCE then provided Eckstein with a duffle bag filled with cash.  See PSR ¶ 31, at 15-16.  Further, in a December 7, 2012, conversation between CHS-1 and Eckstein, "CHS-1 explained to Eckstein the hierarchy of the UCE and CHS-1 business, telling Eckstein that there is a ladder with one 'big dude that runs the whole operation,' and then explained that the UCE was below that person, and that CHS-1 is further down the ladder."  PSR ¶ 38, at 17.  Finally, Eckstein admitted that "there was a high probability that the CHS and the UCE were holding themselves to be drug dealers and the money provided to him by the UCE was proceeds of drug trafficking, however, he deliberately blinded himself to the existence of those facts . . . "  PSR ¶ 44, at 19.

In sum, the Court will overrule Eckstein's objection to the PSR's application of a 6-level enhancement under § 2S1.1(b)(1), because the United States has established by a preponderance of the evidence that Eckstein knew or believed that the laundered funds were drug proceeds (or were represented to be because this was a sting operation).

### III.   THE COURT WILL SUSTAIN ECKSTEIN'S OBJECTION TO THE PSR'S APPLICATION OF A 2-LEVEL ENHANCEMENT UNDER § 2S1.1(b)(3) FOR "SOPHISTICATED LAUNDERNG."

The Court will sustain Eckstein's objection to the PSR's application of a 2-level enhancement under § 2S1.1(b)(3) for "sophisticated laundering."  Under § 2S1.1(b)(3), a 2-level enhancement will be applied to the defendant's offense level if: (i) the defendant is convicted of violating 18 U.S.C. § 1956; and (ii) the offense involved sophisticated money laundering. U.S.S.G. § 2S1.1(b)(3).  The application note to § 2S1.1 defines "sophisticated laundering" as "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense," and it typically involves the use of "fictitious entities," "shell corporations," "two or more levels (i.e. layering) of transactions," or "offshore financial accounts."  U.S.S.G. § 2S1.1, cmt. n.5(A).  Eckstein asserts that there is insufficient evidence that the offense involved sophisticated laundering.

In United States v. Landwer, 640 F.3d 769 (7th Cir. 2011)(per curiam), the United States Court of Appeals for the Seventh Circuit noted that "application of th[is] adjustment 'is proper when the conduct shows a greater level of planning or concealment than a typical fraud of its kind."  640 F.3d at 771 (quoting United States v. Knox, 624 F.3d 865, 871 (7th Cir. 2010)(Williams, J.)).  In this case, Eckstein argues, see Objections at 5-6, and the United States concedes that Eckstein did not own, list, or create fictitious entities as part of the money laundering scheme, see Response at 23.  Rather, the UCE provided Eckstein with the names of apparently fictitious entities, which Eckstein paid with checks that his own legitimate companies issued.  The UCE's use of fictitious entities cannot form the basis of a sophisticated laundering enhancement under § 2S1.1(b)(3).

In response to Eckstein's objection to the enhancement under § 2S.1.1(b)(3), the United States concedes that the PSR incorrectly stated that Eckstein created the fictitious companies, but provides additional facts in support of the enhancement.  See Response at 23.  First, the United States contends that "[t]he defendant bragged about how he could issue checks citing fraudulent work that, in light of his numerous businesses and holdings, would not raise any red flags." Response at 23.  Eckstein's "bragging," however, has no bearing on whether the scheme in fact involved sophisticated money laundering.  The United States further asserts:

> [T]he defendant then cited work that had not yet been performed, but that related to holdings or assets that he did, in fact have.  By reference work that had not been performed by the fictitious companies, but referencing properties or loans that actually existed, had this not been a sting operation, the laundering would have been very difficult to detect.

Response at 23.  In United States v. Jarrett, 2011 WL 6034475 (N.D. Ind. 2011)(Lee, J.), the defendant created a legitimate company, later received drug proceeds and placed them into the company's bank account, and "paid the drug dealers (and the IRS) from that same account." 2011 WL 6034475, at *5.  The defendant "prepared false stock purchase agreements and stock certificates to make it appear that the deposited money orders and cash were for legitimate business investments in his corporate account."  2011 WL 6034475, at *5.  Additionally, the government presented evidence that the defendant "prepared false investment documents to disguise the nature of his transactions, utilized corporate bank accounts to disguise transactions, made cash deposits in amounts sufficient to avoid various reporting requirements and gradually withdrew funds from the accounts to avoid detection."  2011 WL 6034475, at *5.  The District Court concluded that the scheme was not "sophisticated" under § 2S.1.1(b)(3), because it "was typical of all money laundering operations.  [The defendant] took in dirty money, cleaned it up,

and kept some for himself."  2011 WL 6034475, at *5.  In the court's view, the "concealment" was unsophisticated and typical of money laundering operations.  2011 WL 6034475, at *5.

As in United States v. Jarrett, this case involves a relatively unsophisticated and typical money laundering operation.  Eckstein "took in dirty money, cleaned it up, and kept some for himself" before distributing it to the UCE with checks issued by legitimate corporations that he owned.  United States v. Jarrett, 2011 WL 6034475, at *5.  Eckstein's mere reference to "work that had not been performed" while "referencing properties or loans that actually existed" falls short of "conduct show[ing] a greater level of planning or concealment than a typical fraud of its kind."  United States v. Landwer, 640 F.3d at 771.  There must be such a thing as "garden-variety" money laundering if § 2S1.1(b)(3) is to retain any meaning.  In the end, if Eckstein's money laundering operation qualifies as "sophisticated," so too does every money laundering operation.  Thus, the Court will sustain Eckstein's objection to the PSR's application of a 2-level enhancement under § 2S1.1(b)(3) for "sophisticated laundering."

**IT IS ORDERED** that the Defendant Jerome Eckstein's Formal Objections to the Presentence Report, filed May 26, 2015 (Doc. 929), is sustained in part and overruled in part. Defendant Jerome Eckstein's objection to the application of a 2-level enhancement under § 2S1.1(b)(3) for "sophisticated laundering" is sustained and Eckstein's other objections are overruled.  The Court sentences Eckstein to fifteen months imprisonment, and imposes three-year term of supervised release.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
   United States Attorney
Joel R. Myers
Cynthia Weisman
Stephen R. Kotz
Shana Long
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

   *Attorney for the Defendant*